UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

DAVID FLYNN,
             Plaintiff

v.                                          Civil Action No. 1:21-cv-10256-IT

MICHAEL J. WELCH, JIM FORREST, and
STEPHEN TRAISTER,
             Defendants

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Pursuant to Fed. R. Civ. P. 56 and L.R. 56.1, Defendants Michael J. Welch, Jim Forrest, and Stephen Traister (together, "Defendants") submit this Memorandum of Law in support of their Motion for Summary Judgment. As set forth below, Defendants are entitled to judgment as a matter of law on all counts of Plaintiff's Complaint. Defendants submit this Memorandum, Defendants' Rule 56.1 Statement of Undisputed Facts and the Affidavit of Brian E. Lewis in support of Defendants' Motion.

## INTRODUCTION

Plaintiff David Flynn, the former head football coach at Dedham High School, has asserted two claims under 42 U.S.C. §1983, alleging (1) retaliation for protected petitioning of the government and (2) retaliation for protected speech. Specifically, Plaintiff alleges that Defendants' January 2021 decision to not reappoint him as the head football coach position violated his First Amendment rights, which he exercised in publicly criticizing certain actions of the Dedham Public Schools and Defendant Superintendent Welch in October 2020.

Defendants' decision to not reappoint Plaintiff to the coaching position did not violate his First Amendment rights. Rather, the undisputed facts demonstrate that Plaintiff, as a public employee of Dedham Public Schools, does not have an unlimited right to challenge and criticize his employer.

Defendants had the right to not reappoint Plaintiff because his public, derogatory comments about the Superintendent Michael Welch, as well as his repeated, public xenophobic statements in opposition to the promotion of diversity and equity in the Dedham Public Schools (essential elements of the Dedham Public Schools' curriculum, mission, goals, and values) jeopardized the efficient operations of the school system.  Moreover, even if Defendants' decision infringed on his constitutional right, Defendants' actions are protected by the doctrine of "qualified immunity," as there is no evidence that Defendants blatantly violated Plaintiff's known constitutional rights.

For these reasons, as more fully described below, this Court should grant Defendants' Motion for Summary Judgment and dismiss Plaintiff's claims.

## SHORT FACTUAL BACKGROUND[1]

Plaintiff is a resident of Dedham and had two children enrolled in Dedham Public Schools in the fall of 2020.  **SOF ¶¶1, 4**.  Plaintiff also was the head football coach at Dedham High School since 2011.  **SOF ¶ 1**.  Each year, Plaintiff received a one-year appointment to coach the team and received a stipend for his work.  **SOF ¶ 3**.  In 2019, the last year Plaintiff coached the high school football team, he received a stipend of $9,936.  **SOF ¶ 3**.

In the fall of 2020, Plaintiff became concerned about changes in his daughter's 7th grade social studies class.  **SOF ¶ 7**.  Specifically, Plaintiff was concerned that the 7th grade teacher was covering the topics of equity, race, gender, and discrimination, and not covering the published curriculum of "Ancient Civilizations."  **SOF ¶ 7**.  Plaintiff was also concerned that his daughter's 7th grade teacher was showing support for the "Black Lives Matter" movement, as the teacher's on-line avatar during remote lessons displayed a "Black Lives Matter" t-shirt.[2]  **SOF ¶ 11**.

---

[1] Defendants' complete statement of facts is contained in Their Local Rule 56.1 Concise Statement of Material Facts as To Which There is No Genuine Issue to be Tried ("SOF"), which is being filed herewith.

[2] During this time, because of COVID, Dedham Public Schools was teaching remotely.

Plaintiff first communicated his concerns with his daughter's 7th grade teacher, as well as the Principal for the Dedham Middle School.   **SOF ¶ 8**.   Plaintiff was unsatisfied after his communications with the school; therefore, he escalated his concerns to Superintendent Michael J. Welch and indicated that he intended to withdraw his children from the Dedham Public Schools.  **SOF ¶¶ 8-12**.  Welch offered to meet with Plaintiff (and his wife).  **SOF ¶ 12**.

On October 22, 2020, Welch met with Plaintiff and his wife.  **SOF ¶ 13**.  During this meeting, Plaintiff openly challenged and mocked many of the school district's goals and values, such as teaching the principle of equity, actively seeking non-white educators, promoting the understating of cultures from the around the globe, and teaching students to view the world through different lenses of diverse lived experience.  **SOF ¶ 14**.  Following the meeting, Plaintiff emailed several members of the Dedham School Committee to complain about his meeting with Welch and to express his views about the school district and Welch.  **Welch Exhibit 6; October 22, 2020 Email**.  Plaintiff's email's title included the words "Please Share" and was intended to be widely shared within the Dedham community.  **Id**.

In the email, Plaintiff was highly critical of the Dedham Public Schools and Welch.  In addition, Plaintiff expressed an intolerant position on many important issues, such as Diversity, Equity, and Inclusion.

Plaintiff's email stated, among other things,

- Welch only met with him so he could say "he listened to us"

- "Equity is not humanly possible. . . . . Equity is a word used by socialist [sic]."

- Students and families from global cultures should not follow their own cultures when in America; rather, they should adapt to American culture.  [Plaintiff] should not have to adapt to their cultures.

- The hatred and violence involved in the BLM movement will all come out and everyone will see for themselves very soon.

- Celebrating Thanksgiving and Christmas in peace and harmony [in 2020] may be in jeopardy because of the BLM movement.

- Dedham Public Schools was starting the process of division which leads to civil unrest.

- Welch supports BLM, and Welch thinks employees in the school need to be taught how to care for, communicate with and understand the lives of people from all races/cultures (this statement was intended as a criticism).

- Welch "acted like a weak, soft canary and did nothing about the issues in the schools that will all become a real major problem involving hatred and violence very soon."

  **Welch Exhibit 6; October 22, 2020 Email, pg. 2-5**.

After receiving a copy of Plaintiff's October 22, 2020 email, Superintendent Welch discussed its contents, and Plaintiff's other comments made during the earlier meeting, with Dedham High School principal, Defendant Jim Forrest; Dedham High School Athletic Director, Defendant Stephen Traister; members of the School Committee and the Dedham Public School's legal counsel.  **SOF ¶¶ 16-17**.  Defendants made a preliminary determination that given Plaintiff's public statements about the school district and Superintendent Welch, along with his stated and entrenched opposition to the school district's mission and goals, Plaintiff could no longer represent the high school as the head football coach.  **SOF ¶ 19**.  At that time in fall 2020, however, it was not clear whether there would be a high school football season during that academic year (because of COVID), so Defendants did not take any further action.  **SOF ¶ 18**.

In late 2020/early 2021, Defendants learned that there would be a high school football season in spring 2021.  **SOF ¶ 19**.  As such, Defendants needed to act.  **SOF ¶ 19**.  On January 20, 2021, Defendants met with Plaintiff to discuss his email and to provide him an opportunity to modify his position or apologize for statements about Welch and Dedham Public Schools.  **SOF ¶¶ 20-21**.  During this meeting, Plaintiff reiterated his opposition to the school's commitment to equity and did

not apologize for his actions.  **SOF ¶ 21**.  As such, during this meeting, Plaintiff was notified of the decision not to reappoint him as the high school's head football coach.  **SOF ¶ 21**.  Thereafter, Defendants sent a letter to parents and students involved in the football program, announcing the decision.  **SOF ¶ 22**.

<u>**ARGUMENT**</u>

### I.   Summary Judgment Standard

Summary judgment is proper if there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  While the moving party bears the initial burden of showing that there is no issue of material fact, once that burden is satisfied, it then shifts to the "non-moving party to set forth specific facts showing that there is a genuine, triable issue."  <u>PC Interiors, Ltd. v. J. Tucci Constr. Co.</u>, 794 F. Supp. 2d 274, 275 (D. Mass. 2011).  Summary judgment is proper in § 1983 cases when the plaintiff rests merely upon "conclusory allegations, empty rhetoric, unsupported speculation, or evidence which, in the aggregate, is less than significantly probative."  <u>Thomas v. Town of Salisbury</u>, 277 F. Supp. 3d 161, 170 (D. Mass. 2017); <u>quoting</u> <u>Tropigas De P.R., Inc. v. Certain Underwriters at Lloyd's of London,</u> 637 F.3d 53, 56 (1st Cir. 2011).

### II.   Plaintiff's Claims Of Retaliation Should Be Dismissed As A Matter of Law.

Plaintiff alleges that Defendants unlawfully retaliated against him because of his exercise of his First Amendment rights when Defendants chose to not reappoint him as head football coach at Dedham High School because of the views expressed in his October 22, 2020 email.  Plaintiff's claim, however, must fail.  While Plaintiff, as a public employee, enjoys some First Amendment protections to express his views, this protection is not unlimited.  Defendants had the right to end their relationship with Plaintiff to ensure the efficient operation of the school system and the consistent promotion of the school district's core values, including equity and inclusion.  Moreover, Plaintiff did not enjoy an

unfettered right to criticize Superintendent Welch and to accuse him publicly of misdeeds and creating a culture that would lead to violence.

As an initial matter, the undisputed facts demonstrate that it was <u>only</u> Plaintiff's October 22, 2020 email that resulted in Defendants' decision not to reappoint Plaintiff as football coach. **Welch Dep., 119:12-120:1, 121:14-23**.  Plaintiff's earlier email to Superintendent Welch regarding the specific lessons and curriculum in his daughter's 7th grade class was <u>not</u> the basis of Defendants' decision.  Likewise, Plaintiff's decision to remove his children from the Dedham Public Schools was <u>not</u> the basis for Defendants' decision.

### A.      Plaintiff, As A Public Employee, Does Not Have Unlimited First Amendment Rights In The Context Of His Public Employment.

As a public employee working for the Dedham Public Schools, Plaintiff's free speech rights are not unlimited.  "When a citizen enters government service, the citizen by necessity must accept certain limitations on his or her freedom." <u>Meagher v. Andover Sch. Comm.</u>, 94 F. Supp. 3d 21, 35 (D. Mass 2015); <u>quoting</u> <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 418 (2006).  The Supreme Court and the First Circuit have continually enforced this principle because "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services." <u>Garcetti</u>, 547 U.S. at 418. "Consequently, 'a governmental employer may impose certain restraints on the speech of its employees, restraints that would be unconstitutional if applied to the general public.'" <u>Meagher</u>, 94 F. Supp. 3d at 36; <u>quoting</u> <u>Davignon v. Hodgson</u>, 524 F.3d 91, 100 (1st Cir. 2008).  Further, a governmental employer may terminate an employee whose speech jeopardizes the successful and efficient operation of the employer.  <u>see</u>, <u>e.g.</u>, <u>Hennessy v. City of Melrose</u>, 194 F.3d 237 (1st Cir. 1999) (Public school officials justified in terminating student teacher for expressing public displeasure about school curriculum and for disrespectful comments made to the school's principal).

**B.      In Determining Whether Plaintiff's Speech Is Protected, Courts Employ A Three-Part Test, Which Includes A Balancing Test.**

In determining whether an adverse employment action (such as the non-reappointment as head football coach) unlawfully violates a public employee's right to free speech, this court must apply a three-part test.  Meagher, 94 F. Supp. 3d at 36; citing Curran v. Cousins, 509 F.3d 36, 45 (1st Cir. 2007); Garcetti, 547 U.S. at 418; Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968).  First, this court must determine "whether the employee spoke as a citizen on a matter of public concern."  Id. If the employee was not speaking as a citizen on a matter of public concern, there is no First Amendment protection attached to the speech.  Next, if the court concludes that the employee was speaking as a citizen on a matter of public concern, the court must "balance ... the interests of the employee, as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." Id.  If the employer's interests outweigh the employee's interest, then the speech is not protected. Finally, the employee must "show that the protected expression was a substantial or motivating factor in the adverse employment decision."  Id.  Here, Plaintiff's claims fail because he was not speaking as a private citizen on a matter of public concern when he demeaned Superintendent Welch and publicly belittled the Dedham Public School's values.  Further, in applying the balancing test in step two, it is clear that Defendants' interests in promoting the success of its public schools and its values of diversity, equity and inclusion and ensuring that its head football coach supported those values, outweighed Plaintiff's interest in promoting his own intolerant views.

**C.      Plaintiff's Complaints About The School District And Superintendent Welch Are Not Protected Expression Because His Complaints Were Not Delivered As A Private Citizen.**

As an initial matter, Plaintiff's October 22, 2020 email was not constitutionally protected, as he was not speaking as a private citizen when he attacked the school district's values and goals and

insulted Superintendent Welch.  To determine when a public employee is speaking as a private citizen, the First Circuit looks to "several non-exclusive factors," which include:

> whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at her place of employment; whether the speech gave objective observers the impression that the employee represented the employer when she spoke (lending it 'official significance'); whether the employee's speech derived from special knowledge obtained during the course of her employment; and whether there is a so-called citizen analogue to the speech.  Gilbert v. City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019); citing Decotiis v. Whittemore, 635 F.3d 22, 32 (1st Cir. 2011).

First, the nature and subject matter of Plaintiff's October 22, 2020 email demonstrates he was not speaking as a private citizen.  Plaintiff's xenophobic email was about the policies and practices of his own employer and Superintendent Welch, his ultimate supervisor.  It went beyond the areas of concern that could reasonably be attributed to another parent or member of the community.  Plaintiff mocked the school district's commitment to equity, its active attempts to hire non-white educators, and its promotion of understating other cultures and lenses of experience. **Welch Exhibit 6; October 22, 2020 Email; pg. 2-5**.  These are values that guide the hiring of Plaintiff's colleagues and establish the messages that students are to be taught both in the classroom and during extracurricular activities, like sports.

Additionally, the context of Plaintiff's October 22, 2020 email shows he was not speaking as a private citizen.  Plaintiff was communicating with his ultimate supervisor to express his disagreement with school policies and values.  The First Circuit has held that "complaints or concerns made up the chain of command -- is the quintessential example of speech that owes its existence to a public employee's official responsibilities and thus is not protected under the First Amendment." Gilbert, 915 F.3d at 83.  Because Plaintiff was bringing complaints and concerns about his work place up the chain of command to the leader of the organization, Plaintiff's interactions are more like those of an employee of Dedham Public Schools than an ordinary citizen.

Finally, Plaintiff gave objective observers the impression that he carried some form of official significance and that he was not acting as merely a private citizen or concerned parent.  The email sent by Plaintiff included a signature describing him as the Head Football Coach of Dedham High School.  **Flynn Dep., 79:16-24**.  Dedham schools have "traditionally been very involved in athletics, and the head football coach is a prominent position."  **Welch Dep., 54:2-5**.  Plaintiff admitted that he set up the signature on his email account because he wants people to know that he is the head football coach and that his email signature is helpful when responding to certain emails.  **Flynn Dep., 79:16-80:14**.  Plaintiff also acknowledged that he is a representative of Dedham High School when fulfilling his role as head coach and that his name is recognizable around town.  **Flynn Dep., 119:12-23, 120:17-21**.  In the October 22, 2020 email, Plaintiff cited his professional experience as an educator and football coach of 27 years.  **Welch Exhibit 6; October 22, 2020 Email; pg. 3**.  By using his recognizable name, in an email labeled "Please Share," which included an appeal to his extensive professional experience, and which concluded with an official signature from the head football coach at the high school, a prominent position in the community, Plaintiff's speech was likely to give objective observers the impression that it carried official weight.  This impression of official weight was enough to transform Plaintiff's speech from the protected conduct of an ordinary citizen to the restrictable expression of a school district employee.  Because of the above factors, Plaintiff's was not speaking as a private citizen.  Therefore, his speech is not protected and his claims must fail as a matter of law.

### D.     Defendants' Rights In Ensuring A Consistent Voice In Favor Of Diversity, Equity And Inclusion In Dedham Public Schools Outweigh Plaintiff's Right To Openly Criticize The School District's Values.

Even if Plaintiff were speaking as a private citizen, Plaintiff cannot demonstrate a violation of his First Amendment rights because the Defendants' action in support of providing a high-quality education to a diverse student body outweighed Plaintiff's interest in publicly expressing his

xenophobic position. To determine "whether the government had an adequate justification for treating [Plaintiff] differently from any other member of the public," the court must balance "the value of [Plaintiff's] speech . . . against the employer's legitimate government interest in preventing unnecessary disruptions and inefficiencies in carrying out its public service mission." Meagher, 94 F. Supp. 3d at 40; citing Garcetti, 547 U.S. at 418; Davignon, 524 F.3d at 103.

> **i.** **Defendants Had A Legitimate Interest In Protecting Its Educational Mission, As Plaintiff Was Actively Opposed To Dedham Public Schools' Mission And Goals.**

"Public employees. . . . often occupy trusted positions in society. When they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions." Garcetti, 547 U.S. at 419. For that reason, "[t]he Government, as an employer, must have wide discretion and control over the management of its personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch." Hennessy, 194 F.3d at 249. In the First Circuit, a school district's right to restrict speech is greatest when its representatives "statements are contrary to the lessons that it has decided students should be taught or is otherwise inappropriate." Griswold, 625 F. Supp. 2d 49, 60 (D. Mass. 2009); aff'd, Griswold v. Driscoll, 616 F.3d 53 (1st Cir. 2010); citing Conward v. Cambridge Sch. Comm., 171 F.3d 12, 23 (1st Cir. 1999).

Here, Plaintiff's public statements, intended for a wide audience, hindered the efficient operations of the school system and its educational goals. Based on his October 22, 2020 email, Plaintiff's publicly espoused views were:

- "Equity is not humanly possible" and "is a word used by socialist [sic],"
- allowing Budweiser apparel in school would be more appropriate than supporting Black Lives Matter,
- students shouldn't be taught to understand other cultures because Americans "should not have to adapt to their culture, they should adapt to America,"

- supporting Black Lives Matter jeopardizes "peace and harmony" and will lead to division and civil unrest, and threaten the celebration of Thanksgiving and Christmas,
- it is inappropriate for every school employee "to be taught how to care for, communicate with and understand the lives of people from all races/cultures,"
- teaching 12-year-olds about race, equity, and inclusion is indoctrination,
- actively hiring more non-white teachers is not an appropriate goal,
- Dedham Public Schools are creating separation and starting the process of division which leads to civil unrest.

**Welch Exhibit 6; October 22, 2020 Email; pg. 2-5**.

These views directly contradict the stated goals of Dedham Public Schools. Superintendent Welch testified that the school district's goals were "wanting to make sure that equity was a key part of how everyone in the district was accepted" and that "kids and families who are different. . . . would be embraced and accepted and supported and feel welcome in our district." **Welch Dep., 90:17-24**. These views are also reflected in the school's published goals which list equity as a primary objective. **Welch Exhibit 9; School Committee Goals 2018-2021**.

Defendants' January 20, 2021 letter to the football team explaining Plaintiff's nonappointment stated that the decision was made because Plaintiff "has expressed significant philosophical differences with the direction, goals, and values of the school district." **Flynn Exhibit 5; Letter to Players and Families**. In his deposition, Superintendent Welch testified that these irreconcilable philosophical differences arose from Plaintiff's opposition to equity, diversity, and inclusion. "What I meant by philosophical differences," Welch explained, "was the concerns over equity and its importance in the vision of our district as well as our desire to diversify our teaching staff, our desire to make sure that we were providing what students needed to succeed if they did not speak a first language of English." **Welch Dep., 110:3-16**. Superintendent Welch added that "the incompatible nature of [Plaintiff's] views of the direction of the school district and his position as an employee. . . . particularly around his disbelief in equity as a goal of the school district," was a major contributing

factor in the decision not to reappoint Plaintiff.  **Welch Dep., 79:1-15.**

Plaintiff was a public employee who occupied a trusted position in the school district.  His publicly speaking out against the school's goals and publicizing it throughout the community impaired the efficient performance and operations of the school district.  When asked if, given a second chance, he would have been just as critical of the school's focus on diversity, equity, and inclusion, Plaintiff responded "absolutely," showing zero remorse and reiterating his clear intention to oppose the school's objectives.  **Flynn Dep., 125:9-19**.  A head coach making these types of public statements is as impactful and destructive to the goals of the school district as a teacher making these types of public statements (if not more).  As head coach, Plaintiff oversaw all aspects of the Dedham football program including "preparing the boys each and every week" and making "sure that every coach was performing" their duties responsibly.  **Flynn Dep., 19:13-22**.  Just like a teacher, Plaintiff spent countless hours with his student athletes, mentoring them and teaching them values, both on the field during football season and in the weight room during the off season.  **Flynn Dep., 20:10-23**.  Plaintiff was also the primary authority for his six assistant coaches who also taught and mentored the student athletes.  Although he was not tasked with teaching formal lessons, Plaintiff's consistent, direct contact with students gave him significant power to undermine the school's curriculum and values, including diversity, equity, and inclusion.  Allowing Plaintiff to continue as the head football coach, after he publicly and loudly expressed his position on equity and inclusion directly opposite to the school's district's position, would have significant disruptions on the efficient operations of the school system.

     **ii.**     **Plaintiff's Derogatory Remarks About Superintendent Welch Justified Defendants' Actions.**

Defendants' decision not to reappoint Plaintiff was also independently justified because Plaintiff's criticisms about Superintendent Welch were inappropriate and sought to undermine his authority.  The First Circuit has held that "[t]he First Amendment notwithstanding, a supervisor is

entitled to a modicum of respect and decorum in work-related situations." Hennessy, 194 F.3d at 248 (holding a student teacher's negative comments about his school principal had "evinced a level of intransigence and insubordination that no employer should be compelled to tolerate"); see e.g., Curran, 509 F.3d (A county sheriff was justified in terminating a corrections officer who had posted derogatory remarks about the Sherriff on a union website because the comments had the potential to disrupt the sheriff's ability to efficiently discharge his duties.)  Further, schools have a "strong interest in preserving a collegial atmosphere" and "harmonious relations." Hennessy, 194 F.3d at 247.

In Hennessy v. City of Melrose, 194 F.3d 237 (1st Cir. 1999), the First Circuit held that protecting a school's educational message and preventing attacks on a leader's authority were lawful reasons to terminate a school employee.  In Hennessy, a student teacher was terminated after making negative comments about the school's curriculum and principal based on his own Christian views. Hennessy, 194 F.3d.  The student teacher publicly expressed critical views about abortion, decried the denigration of religion in public schools, and balked at participating in a multicultural assembly. Hennessy, 194 F.3d at 242-43.  The First Circuit held that the school's interests outweighed the teacher's protected speech for two key reasons.  First, that "respect for the curriculum . . . .outweighed [his] interest in proselytizing for his chosen cause." Hennessy,194 F.3d at 247.  Second, "[n]othing about the appellant's limited First Amendment interest required the principal to condone actions that she reasonably thought would subvert her hegemony and injure her ability to supervise personnel in the workplace." Hennessy,194 F.3d at 248.

As in Hennessy, Plaintiff's October 22, 2020 email expressed direct opposition to both the curriculum and the leadership of the school district.  Much like Hennessey's strong expression of personal viewpoints, Plaintiff's proselytizing for his chosen cause, a xenophobic position denigrating equity and disparaging of other cultures, at the expense of the school's values, had the intent of undermining the school's objectives.   Further, Plaintiff's personal and public attacks on

Superintendent Welch injured Welch's ability to lead effectively. Because Plaintiff's expressions directly opposed the school district's ability to implement its curriculum and Superintendent Welch's leadership, his speech was not constitutionally protected.

In Plaintiff's October 22, 2020 email which he forwarded to members of the community "over and over and over again," he personally insulted Superintendent Welch. **Flynn Dep., 123:7-8**. Plaintiff wrote about Welch that:

- He only met with Plaintiff and Plaintiff's wife "so he can say he listened to [them]."
- "He acted like a weak, soft canary and did nothing about the issues in the schools that will all become a real major problem involving hatred and violence very soon."
- "He is the wrong man for the job. Every kid in the Dedham Public Schools is in for a rude awakening in some of their classes."
- "He supports BLM."
- "He thinks Dedham is 'astronomically white.'"
- "He allows politics in the classroom."
- "He did not care that his teachers are indoctrinating 12 year old children."
- "He did not care that the Middle School principal lied to us twice."
- "He doesn't care about the people in this town."
- "He was not willing to compromise."

**Welch Exhibit 6; October 22, 2020 Email; pg. 2-5**.

These comments show a severe lack of respect for Superintendent Welch and were an attempt to undermine his authority and control. Superintendent Welch testified that he considered these comments "to be an outrageous response to what I thought was an issue that initially was about curriculum and his daughter's education, but became about me personally." **Welch Dep., 53:13-21**. Welch viewed these personal attacks as "unacceptable." **Welch Dep., 53:13-21**.

Defendants need not show that Plaintiff's words had "an actual adverse effect" to justify their decision not to reappoint him, nor does the law require them to "allow events to unfold to the extent that the disruption . . . . is manifest before taking action." Curran, 509 F.3d at 49. The First Circuit instead merely asks whether the speech had "some potential to affect a public employer's operations,"

giving "[s]ignificant weight . . . . to the public employer's 'reasonable predictions of disruption.'" Curran, 509 F.3d at 49; quoting Waters v. Churchill, 511 U.S. 661, 673 (1994).  In fact, few examples discussed by the courts "involve tangible, present interference with the [government's] operation," instead relying on danger that "is mostly speculative" to justify the termination of employees who make offensive or inappropriate comments.  Curran, 509 F.3d at 49.

Plaintiff's comments about the school district's values and Superintendent Welch were enough to allow Defendants to have reasonably predicted that allowing Plaintiff to remain as the head coach and a representative of Dedham Public Schools could have led to disruptions.  If Plaintiff was reappointed as the head football coach, it would have been a public acknowledgement that one of the leaders at the high school did not believe in the school district's values and goals, which would have led to more difficulty in effecting those goals.  Further, it would have shown that demeaning the Superintendent and accusing him of fomenting violence was acceptable.  Because Defendants acted reasonably in response to Plaintiff's comments, the balance of interest must weigh in Defendants' favor and Plaintiff's claims should be rejected.

**III.    Even If Plaintiff's Speech Was Someone Protected Under The First Amendment, Defendants Are Protected By Qualified Immunity Because Plaintiff's Rights Were Not Clearly Established when Defendants Acted.**

Even if Plaintiff's October 22, 2020 email was protected speech and Defendants' justifications in promoting its core values did not outweigh Plaintiff's right, Defendants' action in deciding not to reappoint Plaintiff as head football coach is protected by the doctrine of qualified immunity. "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.'"  Meagher, 94 F. Supp. 3d at 41-2; quoting Lane v. Franks, 573 U.S. 228, 243 (2014).  "Under this doctrine, courts may not award damages. . . . unless 'the official violated a statutory or constitutional right,' and the 'right was clearly established at the time of the challenged conduct.'"  Meagher., 94 F. Supp. 3d at 42; quoting Ashcroft v. al-Kidd, 563 U.S.

731, 735 (2011).  To determine whether a right was "clearly established," the court must consider "whether the contours of the right were sufficiently clear that a reasonable official would understand that what he is doing violates that right" and "whether in the specific context of the case, a reasonable defendant would have understood that his conduct violated the plaintiffs' constitutional rights." Decotiis, 635 F.3d at 36.  In sum, unless the "state of the law at the time [give] a defendant clear notice that what he was doing was unconstitutional," then Defendants' action is protected by qualified immunity.  Díaz-Bigio v. Santini, 652 F.3d 45, 50 (1st Cir. 2011).

The First Circuit has emphasized that "[i]mmunity exists. . . .  so long as the official could reasonably have believed on the facts that no violation existed" and "that qualified immunity protects all but the plainly incompetent or those who knowingly violate the law."  Dirrane v. Brookline Police Dep't, 315 F.3d 65, 69 (1st Cir. 2002); Ashcroft, 563 U.S. at 743.  The courts have added that a right is clearly established "only if every reasonable official would have understood that what he is doing violates that right" and if public officials "of reasonable competence could disagree on the lawfulness of the action, they are entitled to immunity."  Díaz-Bigio, 652 F.3d at 50-1; Meagher, 94 F. Supp. 3d at 42; quoting Malley v. Briggs, 475 U.S. 335, 349 (1986).  Because courts must apply a fact intensive balancing test in determining whether a plaintiff's constitutional rights have been violated, "it rarely can be considered clearly established for qualified immunity purposes.  Consequently, it is only in the extraordinary case that qualified immunity will not apply."  Meagher, 94 Supp. 3d at 43 (internal quotations and citations omitted).

This is not such an "extraordinary" case.  At the time of the decision not to reappoint Plaintiff based on his October 22, 2020 email, Plaintiff's First Amendment right to send such an email without recourse was not clearly established.  There was no legal precedent in this circuit, or elsewhere, which would have sufficiently put Defendants on notice that their decision was a clear violation of Plaintiff's constitutional rights.  As noted *supra*, Defendants' rights in promoting the values of the school district

outweigh Plaintiff's right to promote his xenophobic position. At that time there was no direct legal precedent available to guide a school official as to the legality of the decision not to reappoint a high school football coach after the coach expressed open opposition to the school district's values and leadership. As noted above, case law shows that, for the reasons stated above, Plaintiff did not have a constitutional right to his position after sending the October 22, 2020 email.

Defendant's claim of qualified immunity is strengthened by their reliance on legal counsel during their decision-making process. Consultation with counsel and relying on the advice received "should be factored into the totality of the circumstances and considered in determining the . . . entitlement to qualified immunity." Cox v. Hainey, 391 F.3d 25, 34-5 (1st Cir. 2004). Superintendent Welch involved the attorney for Dedham Public Schools in the decision-making process. **Welch Dep., 74:1-21, 94:16-19**. Superintendent Welch had three or four conversations with the district's attorney between October and December 2020 "to make sure whatever [they] did, it was going to be legal." **Welch dep., 62:22-24, 74:1-21**. The attorney "indicated to [Welch] that [they] were within [their] rights to nonreappoint [Plaintiff] legally." **Welch Dep., 74:7-12**. Superintendent Welch testified that "those different conversations led me to believe that we were within our rights to not rehire Mr. Flynn." **Welch Dep., 63:5-7**. It is clear that Defendant Welch thoughtfully considered the decision and acted consistent with legal advice.

Finally, multiple officials made this decision together, bolstering the fact that not "every reasonable official would have understood" this as a violation. Principal Forrest and Athletic Director Traister agreed with Superintendent Welch that not reappointing Plaintiff was the appropriate response to his comments. **Welch. Dep., 81:22-82:10**. Welch also spoke with the chair and vice chair of the school committee before making this decision. Neither official objected to this approach. **Welch Dep., 93:5-15**. Because there was no legal precedent clearly establishing Plaintiff's rights in this situation, because Defendants relied on counsel in making their decision, and because many

17

reasonable officials agreed that not reappointing Plaintiff was an appropriate plan, Defendants are protected by qualified immunity and Plaintiff cannot recover damages, even if Defendants' action violated his rights.

## IV.   Plaintiff Has No Damages, Because None Of His Alleged Harm Resulted From Defendants' Actions.

Even if Plaintiff can prevail on his claim, Plaintiff cannot show any damages. Plaintiff alleges he has suffered "loss of earning, emotional distress, loss of reputation, and harassment." **Complaint ¶¶ 43, 51**. Such allegations are not supported by the facts. Plaintiff has limited damages attributable to Defendants' action.

Plaintiff has not suffered lost income. After Defendants' decision not to reappoint him he was offered many other coaching jobs that he rejected. While the law does not require Plaintiff to "go into another line of work, accept a demotion, or take a demeaning position," it does require him to mitigate his damage with "reasonable diligence" and "he forfeits his right to backpay if he refuses a job substantially equivalent to the one he was denied." Ford Motor Co. v. EEOC, 458 U.S. 219, 231-2 (1982). Plaintiff testified that he has received offers to coach football at both Ashland High School and Westwood High School, "six offers to be a coach at different levels of high school," as well as receiving "a lot of inquiries" from both high schools and colleges about his interest in coaching positions, all of which he turned down "immediately." **Flynn Dep., 167:10-13, 20-22, 168:16-170:4**. In fact, Plaintiff didn't apply for any coaching positions and testified that the reason he didn't attempt to find a new coaching position is because he wants to coach his son's youth team – a reason unrelated to any of Defendants' actions. **Flynn Dep., 138:11-140:2**.

Likewise, Plaintiff cannot establish damages of emotional distress, loss of reputation, and harassment. Any claim of emotional distress, loss of reputation and harassment arise from his alleged treatment by the community after Defendants' decision, yet Plaintiff has tied none of this alleged treatment to Defendants' actions. Plaintiff claims that he was a called a "racist" and a "white

supremacist" both in the community and online.  **Flynn Dep., 142:10-144:23**.  Defendants have not made any such statements.  Dedham Public Schools have made only two public statements about Plaintiff.  **Welch Dep., 106:16-21**.  The first was the January 20, 2021 letter sent to the football team stating that Plaintiff was not being reappointed for "philosophical differences."  **Flynn Exhibit 5; Letter to Players and Families**.  The second was a January 21, 2021 media statement with nearly identical language.  **Welch Exhibit 10; January 21, 2021 Media Statement**.  Neither of these statements involved race, charged topics like Black Lives Matter, or revealed anything about Plaintiff's views.  Plaintiff also testified that he is unaware of anyone that works for Dedham Public Schools calling him a racist. **Flynn. Dep., 145:4-148:21**.

Instead, any public knowledge about Plaintiff's opinions came from Plaintiff's own publications, and therefore any resulting public backlash resulted from his own actions, outside of Defendants' control.  Plaintiff's October 22, 2020 email expressed opposition to values such as Diversity, Equity and Inclusion, as well the Black Lives Matter movement.  Plaintiff asked his friends and family to "please share" his email because he "wanted support and help" as he believed that "the more people that knew what was going on, the better chance [he] had."  **Flynn Dep., 149:9-21**.  His own words were then forwarded to news outlets and published on social media where they garnered a great deal of attention. **Flynn Dep., 150:12-18**.  Plaintiff "starred" in a video entitled "HS Football Coach FIRED for Objecting to BLM/Critical Race Theory" which was uploaded to YouTube with his approval, and which has, at the time this motion was submitted, over ninety thousand views. **Flynn Dep., 152: 1-14**.  There is no evidence that any of this attention is because of Defendants' actions and not the direct result of Plaintiff's intentional publication of his own controversial opinions. Plaintiff's claims of emotional distress, loss of reputation, and harassment are also diminished by the support that he has received from many places, such as receiving "a lot of inquiries" with interest in hiring him as a coach. **Flynn Dep., 167:20-21, 168:16-170:4**. Because none of the harm experienced

by Plaintiff is attributable to Defendants, Plaintiff's claims for damages should be denied.

## **CONCLUSION**

For the foregoing reasons, Defendants respectfully requests that summary judgment enter in their favor as a matter of law, that the Complaint be dismissed in its entirety, with prejudice, and that Defendants be awarded such other and further relief as the Court deems just and proper.

Respectfully submitted,

MICHAEL J. WELCH, JIM FORREST, and
STEPHEN TRAISTER,

By their attorney,

/s/ Brian E. Lewis
Brian E. Lewis, Esq. (BBO #643717)
Jackson Lewis P.C.
75 Park Plaza
Boston, MA 02116
(617) 367-0025

Date: January 28, 2022

## **CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) on January 28, 2022.

/s/ Brian E. Lewis
Jackson Lewis, P.C.

4875-8520-1675, v. 1