## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| DAVID FLYNN, | ) | |
| | ) | |
| *Plaintiff*, | ) | |
| | ) | Civil Action Number: 1:21-cv-10256-IT |
| v. | ) | |
| | ) | |
| MICHAEL J. WELCH, *et al.*, | ) | |
| | ) | |
| *Defendants*. | ) | |
| | ) | |

### Plaintiff David Flynn's Memorandum of Points and Authorities
### in Opposition to Defendants' Motion for Summary Judgment

This is a civil rights action brought by David Flynn against Michael J. Welch, Jim Forrest, and Stephen Traister.  In the Fall of 2020, Flynn was a parent of two Dedham Public Schools students and a lifelong Dedham resident.  He also was the head football coach at Dedham High School.  Concerned about the content of his seventh-grade daughter's "World Geography and Ancient History I" class as well as the way it was being taught, Flynn and his wife Ann spoke with their daughter's teacher.  Because the teacher did not resolve their concerns, the Flynns reached out to the middle school principal.  Dissatisfied with the principal's response, Flynn emailed the superintendent of Dedham Public Schools.  After the Flynns met with the superintendent, the Flynns remained concerned about their children's education, how their concerns were responded to, and the direction of Dedham Public Schools under the superintendent's supervision.  Based on discussions with other parents and citizens, the Flynns believed it was necessary to raise their concerns with the Dedham School Committee and others within the community.  Flynn therefore expressed his concerns in an email dated October 22, 2020, which he sent to several school committee members and approximately twenty other members of the community.  A few months later, Defendants Superintendent Michael J. Welch,

Dedham High School Principal Jim Forrest, and Athletic Director Jim Traister decided not to reappoint Flynn as head football coach.  After informing Flynn of their decision, Defendants emailed football players informing them of their decision.  They also issued a press release to the media.

Although Defendants contend that Flynn was speaking as a public employee and that their interests in the efficient performance of Dedham Public Schools' public services outweighed Flynn's interest in exercising his First Amendment rights, abundant record evidence would permit a jury to find otherwise.  The October 22, 2020 email at issue in this case makes clear that Flynn was speaking as a parent-citizen, not as an employee.  In addition, there is no evidence whatsoever that Flynn's First Amendment activities would have had any impact in the efficient performance of Dedham Public Schools.

Accordingly, Flynn respectfully submits this memorandum and accompanying statement of disputed facts in opposition to Defendants' motion for summary judgment.  For the reasons stated below, Defendants' motion should be denied.

## Argument

### I.      Summary Judgment Standard.

"Summary judgment is appropriate when the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party.  A fact is material if it has the potential of determining the outcome of the litigation.  All reasonable inferences must be drawn in favor of the non-moving party." *Doherty v. American International College*, 2019 U.S. Dist. LEXIS 55774, *11-12 (D. Mass. Mar. 31, 2019) (internal citations and quotation marks omitted).

**II.      Defendants violated Flynn's First Amendment rights.**[1]

To prevail on a First Amendment retaliation claim, a public-employee plaintiff must establish that (1) he spoke as a citizen on a matter of public concern; (2) that his interest in commenting upon those matters outweighed the defendant's interests in the efficient performance of its public services; and (3) that his protected speech was a substantial or motivating factor in the defendant's adverse employment actions.  *Buldoc v. Town of Webster*, 629 F. Supp. 3d 132, 145 (D. Mass. 2009) (citing *Lewis v. City of Boston*, 321 F.3d 207, 218-19 (1st Cir. 2003)).  Defendants do not dispute that Flynn's speech was a substantial or motivating factor in their decision not to reappoint Flynn.  Nor do they dispute that their decision not to reappoint Flynn was an adverse employment action.  In addition, the evidence with respect to the first two prongs is such that a reasonable jury could resolve them in favor of Flynn.

**A.      Flynn spoke as a parent-citizen on a matter of public concern.**

"The first step itself has two subparts: the plaintiff must establish (a) that []he spoke as a citizen and (b) that the speech was on a matter of public concern." *Buldoc*, 629 F. Supp. 3d at

---

[1]      Defendants assert, "As an initial matter, the undisputed facts demonstrate that it was only Plaintiff's October 22, 2020 email that resulted in Defendants' decision not to reappoint Plaintiff as football coach."  Defs' Mem. at 6.  However, Defendants own interrogatory answers prove this assertion is incorrect.  Welch's Interrogatory Answers (Ex. L) at 4 ("The decision not to reappoint Plaintiff as football coach was made based on the statements made and positions taken in Plaintiff's October 2020 *emails* sent to members of the School Committee." (emphasis added)); Forrest's Interrogatory Answers (Ex. M) at 2 ("The decision not to reappoint Plaintiff as football coach was made based on the statements made and positions taken in Plaintiff's October 14 and 23, 2020 emails sent to members of the School Committee.");  Traister's Interrogatory Answers (Ex. N) at 3 ("The decision not to reappoint Plaintiff as football coach was made based on the statements made and positions taken in Plaintiff's October 2020 *emails* sent to members of the School Committee." (emphasis added)).  Because there is a factual dispute as to the reasons why Defendants decided not to reappoint Flynn, Defendants' motion for summary judgment should be denied.

146.  Although it does not appear as though Defendants dispute that Flynn's speech was a matter of public concern, out of an abundance of caution, Flynn will address the issue below.

### 1.    Flynn spoke as a parent-citizen, not as head football coach.

In determining whether a public-employee plaintiff spoke as an employee or a citizen, a court must ask whether the speech underlying the claim was made pursuant to the employee's official duties.  *Gilbert v. City of Chicopee*, 915 F.3d 74, 82 (1st Cir. 2019).  "In considering this question, [the First Circuit] look[s] to several 'non-exclusive factors,' which help distinguish speech by a public employee in a professional versus a private capacity."  *Id*.  They include: whether the employee was commissioned or paid to make the speech in question; the subject matter of the speech; whether the speech was made up the chain of command; whether the employee spoke at his place of employment; whether the speech gave objective observers the impression that the employee represented the employer when he spoke (lending it "official significance"); whether the employee's speech derived from special knowledge obtained during the course of his employment; and whether there is a so-called citizen analogue to the speech. *Id.* (citing *Decotiis v. Whittemore*, 635 F.3d 22, 32 (1st Cir. 2011)).

In their memorandum, Defendants contend that three of the factors favor them: the subject matter of the speech, the speech was made up the chain of command, and the speech gave objective observers the impression that the employee represented the employer when he spoke.  The evidence however does not support Defendants' assertion, and the other four factors favor Flynn.

Defendants assert that Flynn's October 22, 2020 email "went beyond the areas of concern that could reasonably be attributed to another parent or member of the community."  Defs' Mem. at 8.  However, the plain language of the email speaks for itself.  For example, the first sentence

- 4 -

of the email states, "Ann and I had a sit-down meeting with the Dedham Public Schools

Superintendent Michael Welch today regarding the issues involved with the Middle School."

Emails (Ex. B)[2] at P00033-P00037.  Flynn then proceeded to describe not only what he and his

wife discussed with Superintendent Welch during the meeting but also their concerns about the

information that the superintendent shared with them during this meeting.  *See generally id*.

Later in the email, Flynn even wrote, "I will sum up the Superintendents [sic] meeting with my

wife and I."  *Id*.  The evidence shows that the subject matter of Flynn's speech concerned the

meeting he and his wife had with Superintendent Welch and the Flynns' belief that

Superintendent Welch was not the right person to lead Dedham Public Schools.  The evidence –

namely the October 22, 2020 email – would permit a jury to find that such speech does not go

beyond the areas of concern of a parent-citizen.

Defendants also assert that the speech was directed up the chain of command.  However,

neither the Dedham School Committee nor other members of the community are Flynn's

ultimate supervisor.  Defs' Mem. at 8.  Under Massachusetts law, only "a principal may dismiss

or demote any teacher or other person assigned full-time to the school, subject to the review and

approval of the superintendent."  G.L. c. 71, § 42.  In addition, a "superintendent may dismiss

any employee of the school district" (*id*.), which includes athletic coaches.  G.L. c. 71, § 47A.

School committees, on the other hand, only "have the power to select and to terminate the

superintendent, [] review and approve budgets for public education in the district, and [] establish

educational goals and policies for the schools in the district consistent with the requirements of

law and statewide goals and standards established by the board of education."  G.L. c. 71, § 37.

---

[2]      "Ex." citations refer to exhibits to the Declaration of Michael Bekesha in Support of
Plaintiff David Flynn's Opposition to Defendants' Motion for Summary Judgment.

The Dedham School Committee does not have the authority over athletic coaches as members of the committee confirmed in testimony.[3]  White Dep. (Ex. H) at 8:14-15 (When asked if the school committee had hiring and firing authority over athletic coaches, White testified, "absolutely not."); *id*. at 64:9-10 ("I have no decisionmaking as far as that goes."); LaPrade Dep. (Ex. G) at 50:11-12 ("ultimately it was his decision.").  Because Flynn did not send his October 22, 2020 email to Superintendent Welch, Principal Forrest, or Athletic Director Traister, his speech was not made up the chain of command.[4]

Defendants also assert that Flynn's speech gave objective observers the impression that he represented Dedham Public Schools when he spoke.  The evidence however would permit a jury to find otherwise.  As Athletic Director Traister testified, Flynn's October 22, 2020 email "had nothing to do with being the football coach."  Traister Dep. (Ex. D) at 74:6-7.  The email did contain an automatic signature at the end of it, which included "Head Football Coach – Dedham High School."  Defs' Mem. at 9.  But it also included additional information.  The entire automatic signature block reads:

> --
> David M. Flynn
> M.Ed – Moderate Special Needs (5-12) – BHS: LECE Program
> Head Football Coach – Dedham High School
>
> Go Marauders!
> Teamwork-Optimism-Unity-Guts-Heart

---

[3]     Superintendent Welch also testified, "[T]he school committee knows that these are personnel decisions [and] that they are not in control over" them.  Welch Dep. (Ex. C) at 62:17-19.

[4]     This fact further strengthens Flynn's assertion that he was engaging in protected petitioning of the government when he sent his October 22, 2020 email to school committee members.

Emails (Ex. B) at P00033-P00037.  The first sentence under his name refers to his teaching position in another school district (Braintree, Massachusetts).  Traister Dep. (Ex. D) at 81:12-92:4.  Importantly, when Athletic Director Traister saw the first sentence, he did not think Flynn sent the email as a special needs teacher for Braintree High School.  *Id*. at 92:17-22.  In addition, Flynn's signature block also included a reference to the Dedham High School mascot, Marauder. Since he grew up in Dedham and played football for Dedham High School, Flynn always considered himself a lifelong Marauder, even when he was not living or working in Dedham. *See* Flynn Dep. (Ex. F) at 164:3-14.  Moreover, although Flynn "cited his professional experience as an educator and football coach of 27 years" (Defs' Mem. at 9), he did so in one sentence out of a five-page email.  The entire sentence reads, "I told him that I have been a teacher for 22 years and have coached football at every level for 27 years."  Emails (Ex. B) at P00033-P00037.  Flynn did not identify himself as the Dedham High School Football coach in that sentence, and he has never been a teacher within the Dedham Public Schools.  In short, neither of those two instances would prevent a jury from finding that an objective observer would believe that Flynn was speaking as a parent-citizen, not as a representative of Dedham Public Schools, when he sent his October 22, 2020 email.

Furthermore, the remainder of the factors demonstrate that Flynn was speaking as a parent-citizen.  *Gilbert*, 915 F.3d at 82.  Flynn was not paid by Dedham Public Schools to send the October 22, 2020 email.  Welch Dep. (Ex. C) at 60:18-20.  Nor did Flynn speak at the place of his employment.  He did not use his Dedham Public Schools' email account or speak about the issues addressed in the email on the football field or in the locker room with the players.  *Id*. at 60:12-17; 61:11-14.  Nor did the content of Flynn's email derive from special knowledge obtained by him as football coach.  *Id*. at 61:15-19.  All the information contained in the email

was learned by the Flynns during their meeting with the superintendent. *See* Emails (Ex. B) at

P00033-P00037; Welch Dep. (Ex. C.) at 61:20-23. Moreover, there is a so-called citizen

analogue to the speech. Flynn wrote to the superintendent's supervisors about concerns he and

his wife had after meeting with the superintendent. *Id*. at 61:3-10; 61:20-23.[5] Any parent-citizen

can undertake such speech. *Decotiis*, 635 F.3d at 34.

In sum, the evidence would permit a jury to find that the subject matter of the speech was

that of a parent-citizen, not a football coach; that the speech was not directed up the chain of

command; and that an objective observer would not have the impression that Flynn represented

Dedham Public Schools. Summary judgment in Defendants' favor should be denied.

### 2. Flynn spoke on a matter of public concern.

Again, it does not appear as though Defendants dispute that Flynn's speech was a matter

of public concern. Nor could they. The evidence plainly shows that his speech "relate[s] to any

matter of political, social, or other concern to the community." *Davignon v. Hodgson*, 524 F.3d

91, 101 (1st Cir. 2008).[6]

In his email, Flynn discussed numerous issues of concern to the Dedham community.

They include: (1) Dedham Middle School changing the seventh-grade social studies curriculum

---

[5]     Athletic Director Traister described the October 22, 2020 email as "a lengthy email . . .
about the issues that went on at the middle school. It went on about a meeting that Mr. Flynn
and his wife had with Mr. Welch. It went on about how that Mr. Flynn did not think that
meeting went well. . . . I believe it had more about the things that went on at the middle school,
things that went on with his daughter[.] . . . And then it went into the meeting itself that him and
– Mr. Flynn and Mrs. Flynn had with Mr. Welch, and then it spoke of things that Dave didn't
agree with the schools and didn't agree with Mr. Welch." Traister Dep. (Ex. D) at 50:3-19.

[6]     Even if it were disputed, whether his speech was a matter of public concern "is a case-
specific, fact-dependent inquiry," which would be best left for a jury to decide. *Davignon*, 524
F.3d at 101.

without informing parents; (2) a teacher using a Memoji wearing a Black Lives Matter t-shirt; (3)

Dedham Public Schools hiring based on race and teaching critical race theory in the classroom;

and (4) the Superintendent's response to the Flynns' concerns.

With respect to the first two issues, Superintendent Welch agrees that they are matters of

public concern.  He believes the Flynns' concerns about the failure to notify parents about the

curriculum change were valid, and Dedham Public Schools changed their policies in the months

after the October 22, 2020 email.  *See* Welch Dep. (Ex. C) at 18:18-20; *id*. at 46: 11; *id.* at 37:7-

14 ("We've made changes in policy at the school committee level.  We've established a

curriculum advisory that incorporates parent and community members to broadly review any

changes around curriculum or concerns that may arise.  And I made it clear to [the Assistant

Superintendent] that if were there changes that were occurring in curriculum, we should be

notifying parents in advance so they're aware.").  Superintendent Welch, like the Flynns, also

had concerns about the teacher's use of a Black Lives Matter Memoji.  *Id*. at 20:17-21:13.

Several school committee members also agreed with the Flynns' concerns.  LaPrade Dep. (Ex.

G) at 11:21-12:1; *id*. at 94:4-8; White Dep. (Ex. H) at 23:14-16; Briggs Dep. (Ex. I) at 43:24-

45:4.

With respect to the other two issues, they too are a matter of public concern.  Whether

critical race theory should be taught in public schools and whether race should be a factor in

hiring were – and still are – topics being debated across the country.[7]  Similarly, whether a

---

[7]     *See e.g.,* Richard L. Cravatts, *There's cause for concern in teaching critical race theory*,
The Boston Globe (Jul. 5, 2021, available at https://www.bostonglobe.com/2021/07/05/opinion/
theres-cause-concern-teaching-critical-race-theory/) ("Since the Minneapolis police murder of
George Floyd last spring, the ascent of the Black Lives Matter movement, and a renewed
emphasis on teaching critical race theory in public schools, school systems nationwide have been
adding diversity, equity, and inclusion offerings.  But as they do so, districts find themselves

public official, like the superintendent, is adequately performing his duties is a matter of inherent public concern. *Davignon v. Hodgson*, 524 F.3d 91 at 102. In addition, the content of Flynn's emails were topics of discussion at school committee meetings. White Dep. (Ex. H) at 75:23-76:5 (Q: "Has the content of Mr. Flynn's emails been a topic of discussion at any school committee meetings?" A: "Yes." Q: "Do you know how many school committee meetings?" A: "A few. I don't know exactly."). The issues of concern to the Flynns and raised in the October 22, 2020 email were matters of public concern.

### B. Flynn's interest in commenting upon those matters outweighed Defendants' interests in the efficient performance of Dedham Public Schools' public services.

Citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the First Circuit has held:

> Government employers, like private employers, need a significant degree of control over their employees' words and actions; without it, there would be little chance for the efficient provision of public services. Because public employees often occupy trusted positions in society, when they speak out, they can express views that contravene governmental policies or impair the proper performance of governmental functions. However, because a citizen who works for the government is nonetheless a citizen, so long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively.

*Curran v. Cousins*, 509 F.3d 36, 47 (1st Cir. 2007). Because Defendants do not seriously challenge – nor could they – the value of Flynn's October 22, 2020 email, Defendants justify their decision to not reappoint Flynn on two grounds. First, Defendants argue that they had a legitimate interest in protecting Dedham Public Schools' educational mission. Second, they argue that they were entitled to a modicum of respect and decorum. Neither has any merit.

---

butting heads with parents and others alarmed at the extent to which discussion of race has been forced into schools."). Furthermore, Defendants' repeated use in their brief of intemperate language such as "xenophobic" to describe the Flynns' sincere personal beliefs is misplaced and inappropriate.

In support of their assertion that they were justified not to reappoint Flynn because he expressed views held by him and his wife that were contrary to the school district's educational mission, Defendants rely on two cases: *Hennessy v. City of Melrose*, 194 F.3d 237 (1st Cir. 1999) and *Griswold v. Driscoll*, 625 F. Supp. 2d 49 (D. Mass. 2009).  However, both cases concern classroom speech, which is not present here.

In *Hennessy*, the adverse action against a student teacher took place after four incidents: a conversation in school with a teacher, which frightened the teacher (194 F.3d at 247); "audible denigration and visible petulance in the learning environment, in front of students and others" (*id.* at 248); calling an art exhibition "disgusting" and "obscene" during class and in front of parents and pupils (*id.*); and "challeng[ing] the propriety of permitting such activities to occur in the public schools and remain[ing] adamant about the moral correctness of his position" during a meeting with the principal.  *Id.*  As the First Circuit succinctly stated, the adverse action taken against *Hennessy* "had nothing to do with the content of [his] statements, and everything to do with the time, place, and manner in which he communicated his sentiments."  *Id.* at 249.  The facts in *Hennessy* could not be more inapposite.  Here, Flynn communicated with members of the school committee and other members of the community.  He did not email any of the defendants, who he reported to as football coach.  Nor did he email other coaches, teachers, or any students.  He also did not let his long-held, sincere personal views interfere with his job.[8]  As all Defendants acknowledged, there has never been a concern that Flynn was treating players differently based on race, because English was not their first language, or based on their economic status.  Welch Dep. (Ex. C) at 86:2-5; *id.* at 88:20-89:6; Traister Dep. (Ex. D) at

---

[8]     As Welch even testified, it is possible for an individual to have personal beliefs but also perform a job separate and distinct from those personal beliefs.  Welch Dep. (Ex. C) at 90.

125:17-21.  Nor are Defendants aware of any instances where Flynn was not being equitable on the football field towards players.  Welch Dep. (Ex. C) at 85:6-16; Traister Dep. (Ex. D) at 125:10-16; Forrest Dep. (Ex. E) at 82:22-83:15.  Nor are they aware of any instances where Mr. Flynn did not embrace, support, or welcome a player or potential player on his football team. Welch Dep. (Ex. C) at 91:1-5.  Simply put, the evidence would permit a jury to find that Flynn would not be a hindrance to the efficient operations of Dedham Public Schools or its educational goals, like the student teacher in *Hennessy* was to his school district.

Similarly, with respect to their reliance on *Griswold*, Defendants cherry pick a sentence out of that decision and misapply it.  Defs' Mem. at 10.  The entire paragraph reads:

> A state or local school board has a greater right to restrict speech by a teacher, who is one of its representatives, if the teacher's statements are contrary to the lessons that it has decided students should be taught or is otherwise inappropriate. As the First Circuit has written: A teacher's classroom speech is part of the curriculum.  Indeed, a teacher's principal classroom role is to teach students the school curriculum.  Thus, schools may reasonably limit teachers' speech in that setting.

*Griswold v. Driscoll*, 625 F. Supp. 2d 49, 60 (D. Mass. 2009) (internal quotation marks and citations omitted).  Flynn's speech did not take place in a classroom or even on the football field. It was contained within an email sent from his personal email account to school committee members and members of the community.  The assertion that *Griswold*'s recitation of a school district's authority to restrict a teacher's speech in the classroom has any relevance to this case cannot withstand minimal scrutiny.

Defendants' argument that they were justified in their action because Flynn expressed strong views of the superintendent faces a similar fate.  Defendants again rely on *Hennessy*, which simply does not apply because Flynn's email was sent to school committee members and members of the community from his personal email account.  It was not sent as part of his

- 12 -

official duties as football coach.  Nor did it concern a disagreement Flynn had with

Superintendent Welch related to football or even Dedham High School, where he was employed.

As Superintendent Welch testified:

> Q:  [W]hen Mr. Flynn wrote "he acted like a weak soft canary, he did nothing
> about the issues in the schools that will become a major problem involving hatred
> and violence very soon."  He again refers to you?
>
> A:  That's my understanding, yes.
>
> Q:  And acted refers to how Mr. Flynn viewed you act[ing] during your meeting
> with him as well as I guess in response to the emails we talked about previously?
>
> A:  I took that to mean the interaction within the meeting.
>
> Q:  And that was the meeting with him and his wife?
>
> A:  Yes.

Welch Dep. (Ex. C) at 59:20-60:17.

In addition, *Curran v. Cousins*, 509 F.3d 36 (D. Mass. 2007) does not save their

argument.  In *Curran*, the plaintiff was a corrections officer who "made highly inappropriate and

violent comments regarding Adolf Hitler and the Nazis on the [union's] website."  509 F.3d at

47.  Specifically, "Curran identifies Hitler as the Sheriff, the Jews as the Correctional Officers,

the Nazi generals as the Department's deputies and captains, and another group – including

himself – as those who may attack the Nazis."  *Id*. at 47-48.  Moreover, Curran's posting

discussed "violent and reference plots against Hitler, whom Curran has repeatedly identified as

the Sheriff."  In other words, "Curran urged a similar secret [assassination] plot against the

Sheriff" by sheriff department employees.  *Id*. at 48.  After reviewing such facts, the First Circuit

concluded that the plaintiff's speech "directly went to impairing discipline by superiors,

disrupting harmony and creating friction in working relationships, undermining confidence in the

administration, invoking oppositional personal loyalties, and interfering with the regular operation of the enterprise."  509 F.3d at 50.[9]

Here, Defendants, without any evidence whatsoever, allege that Flynn's speech "show a severe lack of respect for Superintendent Welch and were an attempt to undermine his authority and control."  Defs' Mem. at 14.  That is it.  Such a bare allegation does not even compare to the serious concerns in *Curran*.  They do not allege that Flynn advocated for employees of Dedham Public Schools to assassinate – or even disobey – Superintendent Welch.  Nor could they. Flynn's October 22, 2020 email simply raises concerns the Flynns had about Superintendent Welch after they met with him about their daughter's education.

Importantly, there were no disruptions to Dedham Public Schools.  Flynn's email was sent on October 22, 2020.  Until Defendants informed the public on January 20, 2021 that Flynn would not be reappointed, no disruptions occurred.  Welch 72:22-73:4 (Ex. C); Forrest Dep. (Ex. E) at 71:21-72:11; Traister Dep. (Ex. D) at 55:15-59:5.  In addition, Defendants did not believe the email would affect how Flynn would coach football.  *Id*. at 51:21-52:1; *id*. at 70:13-71:5; *id*. at 106:7-10; Welch Dep. (Ex. C) at 84:17-20; 87:19-3.  The evidence would permit a jury to decide that Defendants were not justified in their action.

**III.  Defendants are not entitled to qualified immunity.**

"A plaintiff may overcome qualified immunity by first making out the violation of a constitutional right, and second, establishing that the right was clearly established at the time of

---

[9]     The First Circuit also recognized "the 'heightened need for order, loyalty, morale and Harmony' in a law enforcement agency affords it 'more latitude in responding to the speech of its officers than other government employers.'"  *Curran*, 509 F.3d at 50 (citing *Oladeinde v. City of Birmingham*, 230 F.3d 1275, 1293 (11th Cir. 2000)).  A school district is not a law enforcement agency.

the defendant's alleged violation."  *Decotiis*, 635 F.3d at 36 (internal quotation marks and

citations omitted).  "The clearly established step comprises two subparts: first, whether the

contours of the right were sufficiently clear that a reasonable official would understand that what

he is doing violates that right, and second, whether in the specific context of the case, a

reasonable defendant would have understood that his conduct violated the plaintiffs'

constitutional rights."  *Id*. (internal quotation marks and citations omitted).

"A right is considered clearly established if viewed objectively at the time the defendant

acted, he was on clear notice that what he was doing was unconstitutional."  *Id*. at 37 (internal

quotation marks and citations omitted).  "For a constitutional right to be clearly established there

does not need to be a prior case with factually identical circumstances finding such a right."  *Id*.

(internal quotation marks and citations omitted).  "Rather, notable factual differences may exist

between prior cases and the circumstances at hand as long as the state of the law at the time gave

the defendant fair warning that his action or inaction was unconstitutional."  *Id*. (internal

quotation marks and citations omitted).

In addition, "[q]ualified immunity is often applicable in cases of alleged First

Amendment retaliation by a government employer.  That is because the first two elements of the

three-part test – whether the plaintiff spoke as a citizen on a matter of public concern and

whether his interest in commenting outweighs the government's interest in promoting efficiency

– are fact-intensive and can 'rarely be considered 'clearly established' for purposes of the *Harlow*

qualified immunity standard.'"  *Ballinger v. Town of Kingston*, 2019 U.S. Dist. LEXIS 213122,

**49-50 (D. Mass. Dec. 10, 2019) (quoting *McGunigle v. City of Quincy*, 132 F. Supp. 3d 155,

176 (D. Mass. 2015)).

This case is the exception.  Abundant evidence demonstrates that at the time Defendants decided not to reappoint Flynn, Flynn's rights were clearly established.  First, Defendants do not dispute that they took an adverse employment action because of Flynn's speech.  Second, not a single factor supports the proposition that Flynn was speaking as a public employee and not as a parent-citizen.  Based on the four corners of Flynn's October 22, 2020 email, no objective observer would believe Flynn was speaking as anything but a parent-citizen.  Third, Defendants have not demonstrated a legitimate reason why Dedham Public Schools' interests outweighed Flynn's First Amendment rights.  No case has even come close to suggesting speech outside the confines of the classroom (or football field) could be a disruption to the educational mission of the school district.  Similarly, no case comes close to concluding that parents' strong views of how a school district handled concerns about their child's education is not protected speech.  Fourth, according to Superintendent Welch's testimony, when he asked Flynn what his intentions were in sending the October 22, 2020 email, Flynn stated:

> [H]e sent it to a whole bunch of people in the community that he felt were similarly aligned with his thinking, and he intended for that to spark a discussion with the school committee around some of the goals and values and direction the district was taking.

Welch Dep. (Ex. C) at 92:1-7.  Flynn's speech was so clearly protected that a reasonable official would have understood that what he was doing would violate Flynn's First Amendment rights. *See e.g., Mullen v. Tiverton School District*, 504 F. Supp. 3d 21, 33 (D.R.I. 2020); *see also Gustafson v. Jones,* 290 F.3d 895, 913 (7th Cir. 2002) ("Instead, the issue is whether any employer could have thought it was entitled to punish an employee for speech on a matter of public concern where the speech caused no actual disruption of any kind for four months, and where the employer neither articulates a belief that the speech has the potential to be disruptive

in the future, nor has evidence to support the reasonableness of such a belief.  We need look no further than *Connick* to know that the answer to that question is no.  The law to that extent was clearly established, and thus the district court properly denied qualified immunity to the defendants.").

In a last-ditch attempt, Defendants contend that they are entitled to qualified immunity because they relied on counsel and that they made the decision not to reappoint Flynn together. Neither strengthens their claim.  "Reliance on advice of counsel alone does not per se provide defendants with the shield of immunity." *Sueiro Vazquez v. Torregrosa de la Rosa*, 494 F.3d 227, 235 (1st Cir. 2007).  This is especially true when a jury could find that a defendant did not actually rely on the advice of counsel. *Borges Colon v. Roman-Abreu*, 438 F.3d 1, 19 (1st Cir. 2006).  Here, Defendants allege that they relied on the advice of counsel; however, the evidence says otherwise.  When asked, "Did you speak to anybody about Mr. Flynn's First Amendment rights before you decided not to reappoint him," Superintendent Welch testified, "No."  Welch Dep. (Ex. C) at 83:8-11.  In addition, Superintendent Welch testified that he spoke with counsel concerning "contractual issues."  Welch Dep. (Ex. C) at 74:7-75:17.  In other words, Defendants could not have relied on the advice of counsel with respect to Flynn's First Amendment rights because they did not speak with counsel about such rights.[10]

---

[10]     To the extent the Court intends to rule that Defendants are entitled to qualified immunity because of their reliance on counsel, Flynn would respectfully request an opportunity to conduct discovery about the conversations Superintendent Welch had with counsel as well as Principal Forrest's and Athletic Director Traister's understanding of such conversations. *United States v. Locascio*, 357 F. Supp. 2d 536, 550 (E.D.N.Y. 2004) ("[C]ourts have repeatedly concluded that, where a party places matters which would be covered by the attorney-client privilege at issue, such as by asserting a reliance on counsel defense, the attorney-client privilege will be waived in order to prevent the privilege from being used for the purpose of prejudicing an opponent's case by providing only selective disclosure.").  Prior to Defendants' motion for summary judgment, Defendants had not asserted a "reliance on counsel" defense.

Similarly, Defendants suggest that because "multiple officials made this decision together," "not every reasonable official would have understood" not reappointing Flynn because of his speech was a First Amendment violation.  Defs' Mem. at 17.  First, the test is not "every" reasonable official but rather "a" reasonable official.  *Decotiis*, 635 F.3d at 36.  Second, Superintendent Welch did not discuss Flynn's First Amendment rights with the other defendants or even the school committee members.  Welch Dep. (Ex. C) at 82:11-14; *id.* at 83:8-11.  Nor is there any evidence that Principal Forrest, Athletic Director Traister, or the school committee members even considered Flynn's First Amendment rights before they agreed with the decision not to reappoint Flynn because of his October 22, 2020 email.[11]  Defendants are not entitled to qualified immunity.

## IV.    Plaintiff has suffered damages.

Defendants assert that Flynn cannot show any damages.  Defs' Mem. at 18.  The evidence, however, would permit a jury to find otherwise.  First, it is indisputable that Flynn was informed of the decision not to reappoint him approximately one month before the high school football season was to take place.  It is also indisputable that both he and Dedham Public Schools believed he would be the football coach for that upcoming season and that he was to be paid $9,944.00 to coach that season.  Plf's Initial Disclosures (Ex. A) at 14.  In response to this, Defendants allege that Plaintiff failed to mitigate his damages.  The evidence does not support their allegation.  Flynn did not receive offers to coach the season that was to begin in February 2021.  He received offers to coach the season beginning in September 2021.  Flynn Dep. (Ex. F)

---

[11]      In addition, to the extent there is a dispute of material facts concerning what information Defendants possessed at the time they decided not to reappoint Flynn, such issues must be decided by the trier of fact, i.e. the jury. *Kelley v. Laforce*, 288 F.3d 1, 7 (1st Cir. 2002).

at 167:4-168:1 (Flynn testifying on August 26, 2021 why he decided not to coach "this fall" and

how he had "been offered different positions throughout the spring and the summer."); *id.* at

169:2-4 (Flynn testifying on August 26, 2021 that he has received offers to coach football "***this***

***year***.") (emphasis added).  Since his appointments have always been one year, any mitigation

would have had to occur in February 2021, not September 2021.  Regardless, the evidence shows

that he was only offered assistant coaching positions (*id.* at 169:11-17), which would have been a

demotion from his prior position as head coach.

The evidence also would permit a jury to find that Flynn has suffered emotional distress

from Defendants' action.  Flynn testified:

- "My heart was broken.  I've been involved in football my entire life.  And for this to be taken away from me in such a manner, it devastated me." Flynn Dep. (Ex. E) at 167:6-9.

- "I couldn't bring myself to be involved with football.  It just hurt."  *Id.* at 167:13-15.

- "I can't even drive by the high school.  I drove by that school every day of my life.  I don't do it anymore.  I had to find a new route because it hurts me so bad driving by that field of the school."  *Id.* at 167:16-19.

- "I didn't know if I was going to be able to put my whole heart and soul into the job.  And I have a hard time watching football.  I never miss a game on TV.  There's certain games in the spring league and stuff, when they're doing college football previews, I have a hard time watching it.  I'm not interested in it anymore.  I'm not the same person."  *Id.* at 167:23-168:7.

Similarly, the evidence would permit a jury to conclude that Flynn's reputation has suffered

because of Defendants' action.  Flynn's Dep. (Ex. E) at 154:23-155:2 ("I was let go as the

football coach of Dedham High School.  And my reputation as a good football coach I believe

has been tarnished due to it.").  The evidence also would permit a jury to conclude that Flynn

suffered harassment because of Defendants' action.  Flynn sent his email to school committee

members and other members of the community on October 22, 2020.  On January 20, 2021,

Defendants sent a letter and released a press release the following day.  For three months between Flynn's speech and Defendants' actions, he was not called a racist or white supremist. It was only after Defendants publicly announced that Flynn was not reappointed because he "expressed significant philosophical differences with the direction, goals, and values of the school district" that he was called those names.  Initial Disclosures (Ex. A) at 15-16; Flynn Dep. (Ex. E) at 142:18 -144:23; *id.* at 155:9-10.  Although it was unusual for the school district to publicly announce a reason for why an athletic coach was not reappointed, Defendants insisted they do so, even against the advice of school committee members and counsel.  Welch Dep. (Ex. C) at 94:5-12; *id.* at 95:14-18 (Welch testifying that the school committee chair preferred that Defendants "say [Flynn was] not being reappointed without any type of cause" and that the school district's attorney "did not believe that [such language] was necessary.").  The abundant evidence would permit a jury to find Flynn suffered damages.

## Conclusion

For the reasons stated above, Flynn respectfully requests the Court deny Defendants' Motion for Summary Judgment.

Dated:  February 17, 2022

Respectfully submitted,

/s/ Michael Bekesha
Michael Bekesha (BBO No. 675787)
JUDICIAL WATCH, INC.
425 Third Street, S.W., Suite 800
Washington, DC 20024
Tel: (202) 646-5172

*Counsel for Plaintiff*

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent

electronically to the registered participants as identified on the Notice of Electronic Filing (NEF)

and paper copies will be sent to those indicated as non-registered participants on February 17,

2022.

/s/ Michael Bekesha