UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID FLYNN, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | *  Civil Action No. 1:21-cv-10256-IT |
| | * |
| JIM FORREST, STEPHEN TRAISTER, and | * |
| MICHAEL J. WELCH, | * |
| | * |
| Defendants. | * |

MEMORANDUM & ORDER

May 23, 2022

TALWANI, D.J.

Plaintiff David Flynn, the former Dedham high school football coach, brings this action against Defendants Michael Welch, Jim Forrest, and Stephen Traister for violation of his First Amendment rights. He alleges that Defendants' decision not to renew his coaching contract was based explicitly on his statements to members of the school committee and several concerned community members about his daughter's middle school social studies curriculum. Defendants move for summary judgment. The court finds that Flynn's speech regarding his daughter's school curriculum and the instruction she was receiving was made as a parent on a matter of public concern but that Defendants were not prohibited from refusing to renew Flynn's coaching contract based on his criticisms of school administrators and programs. Accordingly, as detailed further below, Defendants' Motion for Summary Judgment [Doc. No. 21] is GRANTED.

I.      **Factual Background**

The following facts are drawn from the summary judgment record and are construed in the light most favorable to Flynn, the non-moving party.

Welch is the superintendent of Dedham public schools. Plaintiff's Statement of Disputed Material Facts ("Pl's SOF") ¶ 2 [Doc. No. 26]. Forrest is the principal of Dedham high school, and Traister is the athletic director. Id.

Flynn is a Dedham resident, and between 2011 and 2019, he was the head football coach for Dedham high school. Id. at ¶ 1. He was appointed to that position annually and received a stipend, which was $9,936 in 2019. Id. at 3. Due to COVID-19, the Dedham public schools began operating remotely in 2020, and there was no high school football season in the fall of 2020. Id. at 6.

That same fall, Flynn's two children were enrolled in the Dedham public schools. Id. at 4. His daughter was in seventh grade at Dedham middle school. Id. On September 11, 2020, Flynn's wife, Ann Flynn, emailed Karen Hillman, the principal of Dedham middle school, requesting a copy of the syllabus for each class that her daughter would be taking. Emails 3 [Doc. No. 27-2]. Hillman responded on September 14, 2020, and directed Ann Flynn to the district's website for the course descriptions. Id. at 2. At that time, the website stated that seventh graders took "World Geography and Ancient History I" for social studies. Id. at 5. However, Flynn was aware that the course had been changed to "Social Science/World Geography." Welch Depo. Exs. 42 [Doc. No. 24-3].

On October 5, 2020, Hillman emailed the Flynns, noting that their daughter's social studies teacher, Kimberly Randall, had brought to her attention that the Flynns had concerns about the content of the social studies course. Id. at 42-43. Hillman explained that

> Social Sciences and History are critically important subjects for our students and we always appreciate it when parents engage in dialog about this content. Understanding our own identity, the identities of others and the perspectives that shape our reality are critical skills in developing students who can understand history, its lessons and how they shape and inform the current social and political context.

2

> While the subject matter is critically important it is also, at times, the most controversial content that we teach in schools as it touches on real issues that adults, like you, have opinions about and histories with. This has always been and will continue to be the case as our curriculum standards and local curriculum adjust to reflect the current context of the world and new understandings about our collective history.
>
> I can appreciate that you may have strong feelings about or disagree with some of the subject matter we cover. I hope you understand that the content we are sharing with students is based on and reflects current state curriculum frameworks and is presented objectively to our students. We fully recognize the importance of being neutral adults in the lives of children. Our role is to support them in making sense of the world, being informed consumers of information, and drawing their own conclusions.

Id. Flynn responded that he was disappointed that he had never been informed that his daughter was taking a "new" social studies course and that the district's website had not been updated to that effect. Id. at 43. He explained that the better he understood the learning goals of the course, the more he could assist his daughter in her work. Id. at 43. He also expressed his hope that Dedham middle school was teaching "these subjects correctly, objectively and with the understanding" that the students were twelve to thirteen years old. Id.

On October 7, 2020, Flynn emailed Welch requesting his "professional opinion" regarding Flynn's concerns about the social studies curriculum. Id. at 41-43. Later that day, Hillman responded to Flynn's earlier email, apologizing for the outdated course description on the website and stating that an update was being worked on to reflect the fact that the seventh-grade curriculum had been revised to focus on civics. Emails 10 [Doc. No. 27-2].

The next day, Welch responded that it appeared as though the district had "not done a great job informing the community about the state's adoption of the updated 2018 History and Social Science framework" and that the website had "not kept up with this evolution." Welch Depo. Exs. 44 [Doc. No. 24-3]. Flynn replied that he appreciated the information and noted that there was "a large group of concerned parents regarding the new social science and history frameworks" and that teaching controversial issues needed to be done in an "objective manner."

3

Id. at 45. He also expressed a specific concern that Randall's "classroom teacher emoji" on the class website was wearing a "Black Lives Matter" shirt. Id. Flynn suggested that if Randall used "a neutral shirt on her emoji, maybe one stating 'Go Marauders'"—the school mascot—"or one that buil[t] pride in their school/community, parents might ease up a bit." Id.

On October 14, 2020, Flynn emailed Welch, stating that the Flynns were removing their children from Dedham public schools. Id. at 47-48. Flynn wrote that Hillman and Randall had "purposely misle[]d" the Flynns about the social studies curriculum, which had been changed "without proper notifications to parents, without a curriculum, without a course syllabus and without a course learning objective." Id. Flynn stated that he had not become aware of the change until the first week of remote school when he noticed that his daughter's classwork involved exercises such as "defin[ing] stereotype, prejudice and discrimination" and that the class website contained an "emoji teacher wearing a black lives matter shirt." Id. Flynn also expressed concern that the course material suggested that police officers are a "risk factor" to black men, given that he had members of law enforcement in his family and that he and Ann taught their kids to respect law enforcement. Id. Flynn stated that he and his wife, "as well as a large group of concerned parents, d[id] not believe that pushing support for black lives matter on a class website [wa]s presenting material objectively." Id. He also noted that he had asked Randall to use a different emoji on the class website, such as one stating "Go Marauders" "due to blm being so controversial." Id. However, Flynn stated, Randall "was also obviously not concerned with the controversial blm slogan on the class website that [wa]s creating an unsafe environment and [wa]s the polar opposite of teaching lessons objectively." Id. Finally, Flynn stated that he was upset that he did not receive a truthful response about the curriculum and the outdated website until after Flynn had involved the superintendent. Id.

4

In response to Flynn's email, Welch asked the Flynns to meet with him. Id. at 49. The meeting took place on October 21, 2020. Pl's SOF ¶ 13 [Doc. No. 26]. The next day, Flynn sent an email to several members of the Dedham school committee, as well as his family and friends. Welch Depo. Exs. 52-56 [Doc. No. 24-3]. A member of the school committee forwarded the email to Welch. Pl's SOF ¶ 15 [Doc. No. 26].

In the October 22 email, Flynn expressed his belief that Welch had called the meeting only to be able to say that he had listened to the Flynns, not to try to keep the Flynns' children in the Dedham public schools. Welch Depo. Exs. 53 [Doc. No. 24-3]. Flynn came away with the impression that Welch and Dedham public schools "seem[ed] to be supporting the BLM movement." Id. Flynn summed up his meeting with Welch as follows:

- [Welch] supports BLM
- He thinks Dedham is "Astronomically White"
- He allows politics in the classroom
- He thinks every employee of the schools need to be taught how to care for, communicate with and understand the lives of people from all races/cultures.
- He has a goal to [hire] more "non-white" teachers
- He did not care that my daughter is scared when she sees the BLM logo in her class
- He did not care that I expressed how much it hurts me to have to remove my children from the schools I attended in the town I grew up in
- He did not care that his teachers are indoctrinating 12 year old children
- He did not care that the Middle School Principal lied to us twice
- He did not care that the school system still has not provided important information on the new controversial classes they are pushing on our kids
- He doesn't care about the people in this town.

Id. at 55. He concluded that Welch was "not willing to compromise" and that "if the teacher [taught] the course objectively and remove[d] the BLM logo from the class, people w[ould] soon get over the fact that the class was purposely created without notifying parents and without having a visible course curriculum, syllabus and learning objective. Id. at 56.

5

In reviewing Flynn's email, Welch became concerned that given these public statements about the school district and Welch, Flynn could no longer represent Dedham high school as the head football coach. Pl's SOF ¶ 15 [Doc. No. 26]. In November and December 2020, Welch discussed these issues with Traister, Forrest, and other members of the school committee, who had similar concerns about Flynn's statements. Id. at ¶ 16. He also had three or four conversations with an attorney for the Dedham public schools about whether there were any legal issues that would prevent him from not reappointing Flynn as the head football coach. Welch Dep. 74-74 [Doc. No. 27-3]. At that time, though, the school district had not made a decision about whether there would be a high school football season in 2020-2021 because of COVID-19, so Welch did not take any action. Pl's SOF ¶ 18 [Doc. No. 26].

In December 2022, Welch learned that there would be a football season in the spring of 2021. Id. at ¶ 19. Welch, Traister, and Forrest therefore made the decision not to reappoint Flynn. Id. They met with Flynn on January 20, 2021, at Dedham high school, and gave him the opportunity to modify or apologize for his statements in the October 22, 2020 email. Id. at ¶¶ 20-21. Flynn did not apologize and stated that he did not believe that equity is effective in certain situations. Id. at ¶ 21. During the meeting, Forrest informed Flynn that he would not be reappointed as the head football coach. Id. A letter to that effect, which had been prepared prior to the meeting, was then mailed to the Dedham high school football players and their parents. Id. at ¶ 22. The letter stated:

> We are also writing today and are sorry to inform you that Dave Flynn will not be reappointed as the Head Coach of Dedham High School football. We met with Mr. Flynn today because he has expressed significant philosophical differences with the direction, goals, and values of the school district. Due to these differences, we felt it best to seek different leadership for the program at this time.

Letter to Football Players [Doc. No. 27-10].

Dedham public schools also issued a media statement in which Welch is quoted as follows:

> The difficult decision not to reappoint Coach Dave Flynn as the Head Coach of Dedham High School football was made due to significant, repeatedly expressed, philosophical differences with the direction, goals, and values of the school district. As a district, we actively try to encourage our staff and students to give constructive voice to their opinions, but must also ensure we stay true to our overarching mission and vision for the district—in the classroom, on the field, and in our community. We want to thank Coach Flynn for his years of coaching leadership for our student athletes at Dedham High School.

Media Statement [Doc. No. 27-11].

## II.   Standard of Review

Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers, Inc., 670 F.3d 119, 125 (1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. Anderson, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. Id. at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. Id. at 314. The non-moving party cannot oppose a properly supported

7

summary judgment motion by "rest[ing] on mere allegations or denials of [the] pleadings." Anderson, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). The non-moving party must demonstrate through "submissions of evidentiary quality, that a trial worthy issue persists." Iverson v. City of Boston, 452 F.3d 94, 98 (1st Cir. 2006). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. Anderson, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

**III.   Discussion**

Flynn has asserted two claims under 42 U.S.C. § 1983, alleging retaliation for protected speech and retaliation for protected petitioning of the government in violation of the First Amendment.

   A.   *Free Speech*

Public employees do not surrender all their First Amendment rights by virtue of their employment; "[r]ather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." Garcetti v. Ceballos, 547 U.S. 410, 417 (2006). But these rights are not absolute: "in recognition of the government's

interest in running an effective workplace, the protection that public employees enjoy against speech-based reprisals is qualified." Mercado-Berrios v. Cancel-Alegria, 611 F.3d 18, 26 (1st Cir. 2010). To balance these competing interests—that of the public employee to speak freely and that of the public employer to operate efficiently—the First Circuit has developed a three-part inquiry to determine whether an adverse employment action against a public employee violated that person's right to free speech. See Gilbert v. City of Chicopee, 915 F.3d 74, 82 (1st Cir. 2019).

> The first part concerns whether the public employee "spoke as a citizen on a matter of public concern." The second part concerns whether, if the employee did so, "the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public." The third part concerns whether, if that government entity did not have an adequate justification, "the protected expression was a substantial or motivating factor in the adverse employment decision." Even then, "the employer must have the opportunity to prove that it would have made the same decision regardless of the protected expression."

Bruce v. Worcester Reg'l Transit Auth., 2022 WL 1564096, at *4 (1st Cir. May 18, 2022) (internal citations omitted).

In this case, there is no dispute for purposes of summary judgment that the decision not to reappoint Flynn as the head football coach was an adverse employment action and that his speech was the factor that motivated that action. The issues are therefore (1) whether his speech qualifies as protected speech, and (2) if so, whether the Defendants' actions were adequately justified by countervailing government interests.

      1.      Protected Speech

To be protected under the First Amendment, speech by a government employee must be made (1) as a citizen and (2) on a matter of public concern. Decotiis v. Whittemore, 635 F.3d 22, 29 (1st Cir. 2011). For purposes of summary judgment, Defendants do not dispute that Flynn's speech was on a matter of public concern. The parties do dispute, however, whether Flynn spoke

9

as a citizen. Defendants argue that Flynn was speaking in his official capacity as the head football coach and that the Constitution therefore does not insulate his speech from discipline. Flynn counters that he was speaking only as a concerned parent.

In determining whether a plaintiff's speech was made as a citizen, rather than pursuant to official duties, courts consider non-exclusive and context-specific factors including (1) whether the employee was commissioned or paid to make the speech; (2) the subject matter of the speech; (3) whether the speech was made up the chain of command; (4) whether the employee spoke at his place of employment; (5) whether the speech gave objective observers the impression that the employee represented the employer when he spoke (lending it "official significance"); (6) whether the employee's speech derived from special knowledge obtained during the course of his employment; and (7) whether there is a citizen analogue to the speech. Gilbert, 915 F.3d at 82 (citing Decotiis, 635 F.3d at 32).

Regarding the subject matter of the speech, Defendants assert that Flynn's email "went beyond the areas of concern that could reasonably be attributed to another parent or member of the community" where it derided the school district's policies and practices. But a reasonable jury could find that Flynn's criticisms were directed at what he perceived to be the school district's repeated failures to adequately inform parents of the changes to the school district's curriculum and values and to address his daughter's concerns.

Regarding whether the speech was made up the chain of command, Defendants argue that Flynn's speech was, in effect, a grievance directed up to his supervisor. However, Flynn initially addressed his concerns about his daughter's class to her teacher and the middle school principal, and it was only after failing to get what he perceived to be a truthful response that he involved Welch for his "professional opinion" regarding the curriculum concerns. Then, after Flynn stated

that he was withdrawing his children from Dedham public schools, Welch requested the meeting that ultimately led to Flynn's October 22, 2020 email. A reasonable jury could find that Flynn's email was sent in his capacity as a parent to the person who convened the meeting and, in Flynn's view, did so with no intention of working through the issues Flynn had raised regarding the curriculum and the teacher's use of the BLM emoji.

      Finally, Defendants claim that Flynn gave objective observers the impression that he represented Dedham public schools because his email signature block included his position as head football coach and because he mentioned his coaching in the email. But the signature block also included Flynn's position as a special needs educator at Braintree high school, and although the email mentioned that he had "coached football at every level for 27 years," that statement was tangential to the substance of his email. A reasonable jury could therefore find that the Flynn's speech was not related to his position as head football coach and that he spoke predominantly as a concerned parent.

      Other facts also support this conclusion. Flynn was not paid to send the October 22, 2020 email. He did not speak at the high school. He used a personal email address. All the concerns that he identified were based on information that he and his wife had learned in their meeting with Welch, which Welch convened in response to the Flynns' decision to remove their children from the Dedham public schools. And, finally, any parent could have voiced similar concerns in the same manner—and indeed there is evidence that other parents shared the Flynns' concerns and that Flynn forwarded his email to some of those parents. Nothing in the record suggests that Flynn would not have had the exact same concerns had he not been the head football coach. The court accordingly concludes that a reasonable jury could find that Flynn's speech was protected speech.

### 2. Countervailing Government Interests

However, "termination because of protected speech may be justified when legitimate countervailing government interests are sufficiently strong" to outweigh the free speech interests at stake. Bd. of Cty. Comm'rs, Wabaunsee Cty., Kan. v. Umbehr, 518 U.S. 668, 675 (1996). "[G]overnment interests outweigh First Amendment rights when employee speech prevents efficient provision of government services or disrupts the workplace." Torres-Rosado v. Rotger-Sabat, 335 F.3d 1, 13 (1st Cir. 2003) (citations omitted). "In performing the balancing, the statement will not be considered in a vacuum; the manner, time, and place of the employee's expression are relevant, as is the context in which the dispute arose." Rankin v. McPherson, 483 U.S. 378, 388 (1987). As such, the court must analyze "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." Id. (citing Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cty., Illinois, 391 U.S. 563, 570-73 (1968)).

Defendants argue that Flynn's October 22, 2020 email hindered the efficient operation of the school system and its educational mission where Flynn's views directly contradicted the Dedham public school system's goals of advancing diversity, equity, and inclusion. Defendants claim that these "irreconcilable philosophical differences" justify not reappointing Flynn because, although he did not teach, Flynn's consistent contact with students would allow him to undermine the school's curriculum and values. In addition, Defendants claim that their decision was justified based on Flynn's derogatory remarks about Welch.

Defendants rely primarily on Hennessy v. City of Melrose, in which the First Circuit held that a school district lawfully discharged a student-teacher for repeatedly disrupting school events with religious "proselytizing," such as showing a picture of an aborted fetus to another teacher and storming out of a presentation on art that he considered "obscene." 194 F.3d 237, 242-43 (1st Cir. 1999). The First Circuit noted that the student-teacher's outbursts were incompatible with general professional standards for preserving collegiality and respect in the school and with the "common teaching competencies" required for state certification. Id. at 243, 247. In reaching this decision, the First Circuit made clear that the defendants' concern over the serial incidents "had nothing to do with the content of the [student-teacher's] statements, and everything to do with the time, place, and manner in which he communicated his sentiments." Id. at 249.

The facts of this case are quite different. Flynn's speech did not take place at school or in front of any colleagues or students. In fact, the email was not sent to any of Flynn's supervisors or colleagues but rather was directed at members of the Dedham school committee, as well as members of the community who shared his concerns. Defendants focus their argument on the fact that Flynn "loudly expressed" an opinion on diversity, equity, and inclusion that directly contradicted the school district's. But mere disputes over policy, without more, cannot outweigh Flynn's free speech interest; the right to express such disagreement is at the core value protected by Free Speech Clause of the First Amendment. Indeed, the Supreme Court has warned that "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse, not because it hampers public functions but simply because superiors disagree with the content of employees' speech." Rankin, 483 U.S. at 384.

But Flynn did not merely criticize the school district's curriculum or values; he also criticized Welch for promoting that curriculum and values. Flynn charged Welch with "not caring" about numerous matters, concluding that Welch "doesn't care about the people in this town." "[A]s a matter of good judgment, public officials should be receptive to constructive criticism offered by their employees[.]" Connick v. Myers, 461 U.S. 138, 149 (1983). Nonetheless, under Pickering, the court must give "full consideration of the government's interest in the effective and efficient fulfillment of its responsibilities to the public." Id. at 150. And an employer need not wait for "events to unfold to the extent that the disruption of the office and the destruction of the working relationships is manifest before taking action." Id. at 152; see also Waters v. Churchill, 511 U.S. 661, 671 (1994) ("potential disruptiveness" sufficient to outweigh First Amendment value in a nurse's statement critical of her supervisor and hospital's obstetrics department because it could discourage individuals from working in that department and undermine management's authority). And finally, of relevance here given the personal nature of Flynn's attack on Welch's integrity, "[t]he First Amendment notwithstanding, a supervisor is entitled to a modicum of respect and decorum in work-related situations." Hennessy, 194 F.3d at 248. Where the summary judgment record is undisputed that Welch was concerned that, given the public statements about the school district and Welch in the October 2 email, Flynn could no longer represent Dedham high school as the head football coach, Pl's SOF ¶ 15 [Doc. No. 26], Flynn's personal attack of Welch is not entitled to First Amendment protection.

  B.  *Petitioning*

Flynn also alleges that the decision not to reappoint him as head coach violated his First Amendment right to petition the government for the redress of grievances where his email was

14

sent to members of the school committee. The Petition Clause encompasses activity directed to a government audience. See Borough of Duryea, Pa. v. Guarnieri, 564 U.S. 379, 399 (2011). But here, where Flynn sent the same "petitioning" email to the Dedham public school community more generally, and the court has found no violation of his Free Speech rights in Defendants' decision to not renew his contract based on those communications, Flynn can show no harm premised on his petitioning activity.

IV.     Conclusion

For the foregoing reasons, Defendants' Motion for Summary Judgment [Doc. No. 21] is GRANTED.

IT IS SO ORDERED

May 23, 2022                                       /s/ Indira Talwani
                                                   United States District Judge